2026 IL App (2d) 260009-U
No. 2-26-0009
Order filed May 15, 2026

**NOTICE:** This order was filed under Illinois Supreme Court Rule 23(b) and is not precedential except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

In re K.N., A Minor,

(The People of the State of Illinois, Petitioner-Appellee v. C.N., Respondent-Appellant).

Appeal from the Circuit Court of McHenry County.
Honorable Carl E. Metz II, Judge, Presiding.
No. 23-JA-77

JUSTICE McLAREN delivered the judgment of the court.
Justices Birkett and Mullen concurred in the judgment.

**ORDER**

¶ 1    *Held*: We grant appellate counsel's motion to withdraw and affirm the trial court's judgment finding respondent an unfit and unable parent, concluding there exist no issues of arguable merit to be raised on appeal.

¶ 2    Respondent, C.N., appeals from the trial court's order finding her unfit and unable to parent her child, K.N. (born June 5, 2016). Her appellate counsel has moved to withdraw under *Anders v. California*, 386 U.S. 738 (1967), stating that she has read the record and concluded there exist no issues of arguable merit to be raised on appeal. See *In re S.M.*, 314 Ill. App. 3d 682, 685 (2000) (applying *Anders* to cases involving parental unfitness). Counsel has supported her motion with a memorandum of law providing a statement of facts, potential issues, and argument as to why those issues lack arguable merit. See *In re Alexa J.*, 345 Ill. App. 3d 985, 988 (2003) (holding

in part that "counsel must identify at least one potentially justiciable issue in a motion to withdraw under *Anders*."). Counsel served respondent with a copy of the motion and memorandum. We advised respondent that she had 30 days to respond to counsel's motion. No timely response was filed. We conclude that this appeal lacks arguable merit based on the reasons set forth in counsel's memorandum. Therefore, we grant counsel's motion and affirm the trial court's judgment.

¶ 3                                    I. BACKGROUND

¶ 4                       A. Neglect Petition and Shelter Care Proceeding

¶ 5        On August 29, 2023, the State filed petitions for adjudication of wardship of K.N., alleging that respondent had abandoned/deserted the minor. The petition alleged that respondent was homeless, had left K.N. home alone for several hours in 2017, had not registered K.N. for school nor taken him to a doctor in several years, and that K.N.'s biological father was a registered sex offender who had access to the minor. K.N. had been living with fictive kin for several years. The petition provided a detailed history of Illinois Department of Children and Family Services (DCFS) interactions with the family, including charges against the father for sexual molestation of K.N.'s sibling. A shelter care hearing was held the same day. The trial court found probable cause for the filing of the petition and appointed a Court-Appointed Special Advocate (CASA). The trial court appointed a Guardian *ad Litem* (GAL) and awarded temporary custody to DCFS.

¶ 6        DCFS investigated the allegations and completed its final finding on October 20, 2023. As to the father, DCFS found that he posed a substantial risk of sexual abuse. As to respondent, DCFS found that she had abandoned/deserted K.N. DCFS found that respondent had dropped K.N. with his paternal great grandmother and he had lived there, or with his paternal uncle, for over three years. The uncle did not have proper documentation for K.N. and was unable to enroll him for school or provide him with medical services during this time. Once K.N. came into the care of

DCFS, he was able to be enrolled in school and see a doctor. DCFS placed K.N. with his uncle, where he remained during the proceedings.

¶ 7 The first Family Service plan was approved on October 27, 2023. The goal was to return K.N home within 12 months, with a goal date of February 29, 2024. The goal for respondent was to complete an integrated assessment, engage in therapy for mental health, engage in substance abuse treatment, receive parenting education, and maintain financial stability, housing, and employment. The goal for the father was similar, including an integrated assessment, therapy, parental education, and maintaining financial stability and housing.

¶ 8                                    1. Adjudicatory Hearing

¶ 9 Respondent and father were not present for the adjudicatory hearing on November 16, 2023, but both were represented by appointed counsel. At the hearing, a Woodstock police officer testified that father was convicted in McHenry County for failure to register as a sex offender. K.N.'s uncle testified the minor had lived with him almost continuously since March 2019. When respondent would return to see K.N., it was infrequent and only for a couple of days. The uncle and his girlfriend cared for K.N. as if he was their child, providing clothes and other needs. The trial court entered an adjudicatory order on November 16, 2023, finding that K.N. was abused or neglected because he was in an environment injurious to his welfare and at substantial risk of physical abuse.

¶ 10                                    2. Dispositional Hearing

¶ 11 The trial court conducted the dispositional hearing on January 18, 2024. The trial court found the Family Service Plan appropriate and agreed to goal of returning K.N. home within 12 months. The court found respondent was unfit and unable to care for, protect, train, educate, supervise, or discipline K.N. Repondent was required to comply with services recommended in

the Family Service Plan. The trial court found the father unfit, unable, and unwilling to provide required care and was instructed to comply with similar recommended services. The court noted that the father had defaulted and his public defender was discharged. The Permanency Hearing was scheduled for August 22, 2024.

¶ 12    DCFS created an updated Family Service Plan on August 8, 2024. The goal remained for K.N. to return home within 12 months, with a goal date of March 31, 2025. The plan noted respondent's progress was limited to the integrated assessment. The father's progress was unsatisfactory in all respects as he had not contacted DCFS, was not engaged in any services, and was incarcerated.

¶ 13    The trial court entered a permanency order on September 6, 2024, changing the goal to substitute care pending termination of parental rights. The State filed its Petition for Termination of Parental Rights on December 12, 2024. A new caseworker was assigned in January 2025. The father provided DNA to confirm that he was K.N.'s father. Neither parent engaged in any of the required services or provided any letters, gifts, or clothing to K.N. The State filed an Amended Petition for Termination of Parental Rights on March 20, 2025.

¶ 14                              B. Termination Proceedings

¶ 15                              1. Parental Fitness

¶ 16    The parental fitness portion of the termination hearing was held on August 21, 2025. The State first called Dionca Harper with DCFS. Harper testified that respondent had left K.N. with his paternal uncle in 2019 without any plan for his future. When she visited the uncle's home, K.N. was safe and DCFS placed him with his uncle after protective custody was established.

¶ 17    Diamond Thomas, a case worker with Ada S. McKinley, testified next. Thomas testified that she had been assigned to K.N.'s case as an investigator in August 2023 and the case worker in

January 2025. Thomas noted that January 2025 was after the goal had already been changed to substantive care pending termination of parental rights. Referring to agency records, Thomas testified that respondent participated in a telephone-based integrated assessment in December 2023. Thomas testified that the integrated assessment was completed on January 11, 2024. Thomas also testified to the service plan, noting respondent was required to complete a psychological assessment, a substance abuse assessment, parenting classes, domestic violence consultation, family therapy, and toxicology drug screens. Thomas testified that respondent had not engaged in any of the services required in the service plan. Respondent had not been in regular contact with K.N. and had visited with him only in March and July of 2025. She had not sent K.N. any letters, gifts, or clothing. Thomas testified that K.N. requested not to have any more visits with respondent after the March 2025 visit. After offering numerous exhibits to be entered into evidence, the State rested.

¶ 18 Respondent's counsel called her as a witness. Respondent testified that she had lived at 1555 S. Miller Avenue since 2015. She had asked K.N.'s paternal great grandmother to take care of him in December 2022 because respondent's sister had been killed and she was unable to care for him. Respondent testified she had signed a notarized letter so that K.N could be enrolled in school and taken to a doctor. She further testified that she had been told that K.N.'s father had reported her to DCFS and K.N. was moved to live with his uncle in 2023. Respondent claimed that DCFS had only reached out to her for the initial assessment, instructed her not to contact DCFS directly, and she had not received referrals for any of the programs in which DCFS asked her to participate.

¶ 19 On cross examination, respondent could not explain why DCFS had recorded her home address as 3302 West Madison Avenue in Chicago in December 2023. Respondent asserted that

her address has consistently been her mother's house at 155 South Miller Avenue but admitted that she is currently homeless. She testified that she had not called the school to verify that K.N. was enrolled and was letting his great grandmother take care of registration. Respondent claimed that she had reached out to DCFS multiple times, but her previous contact did not respond. At the completion of her testimony, respondent rested.

¶ 20    The trial court entered its Memorandum and Decision on Parental Rights on October 1, 2025. In it, the trial court found that respondent had abandoned K.N., had failed to protect him from conditions injurious to his welfare, failed to take reasonable steps to correct the conditions that were the basis for removal or to take reasonable steps and achieve reasonable progress to the return of the child between November 16, 2023 and September 6, 2024.

¶ 21                                    2. Best Interests

¶ 22    On October 28, 2025, the trial court conducted the best interest portion of the hearing on the amended petition to terminate parental rights. Thomas testified again. She noted that K.N. was placed with his uncle and his girlfriend and appeared to be thriving. All of his needs were provided for and K.N. appeared to love them both "very much." K.N. has stated that he wanted to remain with his uncle and his girlfriend and that K.N. asked to not visit with respondent after a single, 15-minute visit. Thomas opined that it was in K.N.'s best interest to have his parents' rights terminated and be placed up for adoption.

¶ 23    The CASA advocate manager assigned to K.N.'s case testified in a manner consistent with Thomas. K.N.'s uncle and his girlfriend both testified that they consider K.N. "my boy" and their "baby." They testified they would raise K.N. as their own child and adopt him, if permitted.

¶ 24    Respondent also testified at the best interests hearing. She offered reasons why K.N.'s uncle should not be allowed to adopt him but admitted on cross examination that she had not seen

the uncle since 2020. Respondent conceded that K.N. should be adopted but stated that she preferred he was adopted by his paternal grandmother, the father and uncle's mother.

¶ 25 The trial court entered its written decision on the petition to terminate parental rights on December 10, 2025. The court noted that father had failed to appear at the parental fitness portion of the hearing and had defaulted. The trial court found that the State had proven by clear and convincing evidence that respondent: (1) abandoned K.N.; (2) failed to maintain a reasonable degree of interest, concern or responsibility as to his welfare; (3) failed to protect K.N. from the conditions within their environment injurious to his welfare; (4) failed to make reasonable efforts to correct those conditions during the period from November 16, 2023, and September 6, 2024; (5) failed to make reasonable progress towards the goal of returning K.N. home during that time period; and (6) demonstrated an intent to forgo her parental rights by failing to maintain contact with or plan for the future of K.N., despite being physically able to do so. As a result, the court found that the State had proven by clear and convincing evidence that both parents were unfit under the Adoption Act. After reviewing the best interest hearing and applicable law, the trial court held that "the State has overwhelmingly proven by a preponderance of the evidence" that it is in the best interest of K.N. that respondent and father's paternal rights be terminated and he be made available for adoption. The trial court thus granted the State's amended petition to terminate parental rights.

¶ 26 Respondent timely appealed.

¶ 27 C. *Anders* Motion

¶ 28 The trial court appointed counsel to represent respondent on appeal. Appellate counsel filed a motion to withdraw pursuant to *Anders* and *Alexa J.* The clerk of this court also issued an

order notifying respondent of the motion and allowing her 30 days to respond. The 30-day period has passed, and respondent has not filed a response.

¶ 29                                    II. ANALYSIS

¶ 30    In support of her motion to withdraw, appellate counsel reviewed the record and closely examined each of the hearings for constitutional, procedural, or evidentiary issues that would constitute a basis for an appellate challenge. As summarized in her motion, appellate counsel examined a potential challenge to diligence of the search conducted by DCFS, rendering it impossible for respondent to complete required services.

¶ 31    The Juvenile Court Act governs the proceedings in which minors may be removed from the care and custody of their parents, made wards of the court, and if necessary, have their parental rights terminated. 705 ILCS 405/1-1 *et seq* (West 2022). In an adjudicatory hearing, the court considers whether a minor child is abused, neglected, or dependent. 705 ILCS 405/18(1) (West 2022). A minor may be found neglected or abused if the State proves by a preponderance of the evidence that the environment is injurious to the minor's welfare. 705 ILCS 405/2-3(b) (West 2022); *In re J.B.*, 2018 IL App (1st) 173096, ¶ 37. If the court determines that the minor is abused, neglected, or dependent at the adjudicatory hearing, the court then holds a dispositional hearing. *In re Kh. M.*, 2023 IL App (1st) 230261, ¶ 37. "At the dispositional hearing, the trial court shall determine whether it is in the best interests of the minor and the public that he or she be made a ward of the court, and, if the minor is to be made a ward of the court, the court shall determine the proper disposition best serving the health, safety, and interests of the minor and the public." *In re Faith S.*, 2019 IL App (1st) 182290, ¶ 78. "The purpose of the dispositional hearing is usually not to terminate parental rights but 'to decide what further actions are in the [minor's] best interests'

- 8 -

and to 'give the parents fair notice of what they must do to retain their rights to their child.' " *In re Tyianna J.*, 2017 IL App (1st) 162306, ¶ 43 (quoting *In re G.F.H.*, 315 Ill. App. 3d 711, 715 (2000)).

¶ 32 The termination of parental rights is a two-step process. *In re Julian K.*, 2012 IL App (1st) 112841, ¶ 1. The State must first establish by clear and convincing evidence one ground of parental unfitness from those listed in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2022)). *In re B.B.*, 386 Ill. App. 3d 686, 698 (2008). "When a termination petition has been filed, the trial court must first decide whether any of the statutory grounds for unfitness alleged in the petition has been proven by clear and convincing evidence." *In re D.C.*, 209 Ill. 2d 287, 296 (2004). If the trial court finds a parent unfit, it then must conduct a second hearing to determine, by a preponderance of the evidence, whether it is in the best interest of the minor to terminate parental rights. *In re E.B.*, 231 Ill. 2d 459, 472 (2008). A parent's rights may be terminated if a single alleged ground for unfitness is supported by clear and convincing evidence. *In re Gwynne P.*, 215 Ill. 2d 340, 349 (2005.) Each case concerning parental unfitness is considered *sui generis* and is decided on its own facts and circumstances presented. *Id.* This court will not disturb a finding of parental unfitness unless it is contrary to the manifest weight of the evidence. *In re Tiffany M.*, 353 Ill. App. 3d 883, 890 (2004). A decision is against the manifest weight of the evidence where the decision is unreasonable. *In re Keyon R.*, 2017 IL App (2d) 160657, ¶ 16.

¶ 33 Under the procedure outlined in *Anders*, counsel's motion must "be accompanied by a brief referring to anything in the record that might arguably support the appeal." *S.M.*, 314 Ill. App. 3d at 685. Counsel is obligated to advocate on behalf of his or her client. *Alexa J.*, 345 Ill. App. 3d at 987. As such, counsel must "(a) sketch the argument in support of the issues that could conceivably be raised on appeal, and then (b) explain why he believes the arguments are frivolous." *S.M.*, 314 Ill. App. 3d at 685. Next, counsel must conclude that no viable grounds

exist for the appeal. Finally, appellate counsel should include the transcripts from the adjudicatory and best-interest hearings. *Alexa J.*, 345 Ill. App. 3d at 989. In doing so, counsel must review both the finding of unfitness and the best interest determinations. *S.M.*, 314 Ill. App. 3d at 686.

¶ 34 *Alexa J.* demands an accompanying *Anders* brief to "set out *any* irregularities in the trial process or other potential error, which, although in [counsel's] judgment not a basis for appellate relief, might *** be meritorious." (Emphasis in original.) *Alexa J.*, 345 Ill. App. 3d at 987 (quoting *In re Brazelton*, 237 Ill.App.3d 269, 271 (1992)). In accordance with *Alexa J.*, counsel identified one potential challenge: did the trial court err in finding the mother unfit when DCFS failed to make reasonable efforts to locate respondent to enable her to engage in services?

¶ 35 Appellate counsel notes in her memorandum that respondent could attempt to present an argument concerning the adequacy of service, summons, and notice under the standards announced in *In re Sheltanya S.*, 309 Ill. App. 3d 941 (1999). However, appellate counsel further notes that the facts and circumstances in that case can easily be distinguished from the facts and circumstances in immediate case. We agree. The burden of the State is described as follows:

> "Where a respondent's usual place of abode is not known, a *diligent inquiry* shall be made to ascertain the respondent's current and last known address." (Emphasis added) 405 ILCS 705/2-16(2) (West 2022).

In *Sheltanya S.*, three different case workers over the course of three years testified to engaging in a search of public aid, telephone directory searches, and following up on the last known address of the parent. *Sheltanya S.*, 309 Ill. App. 3d at 946. The court concluded that DCFS had conducted " 'that kind of search or investigation which a diligent person, intent on ascertaining a fact, would usually and ordinarily make.' " *Id.* at 956 (quoting *In re A.S.B.*, 293 Ill. App. 836, 842 (1997).

¶ 36    In the immediate matter, it could be argued that the case worker did not testify to which address she used to send letters, and it is unclear whether the letters went to 1555 Millard Ave. Thomas became the case worker in 2025 and did not know about any prior searches, diligent or otherwise, prior to that date. The only diligent search shown by evidence provided by the State happened after the goal had already been changed to the termination of parental rights. As such, it could be argued that the search in this case was far below the standard identified in *Sheltanya*.

¶ 37    However, appellate counsel notes that respondent's own testimony undermines this argument. Respondent knew that K.N. was in custody and care of DCFS for over a year. She knew that she had to complete a variety of services based on the two hours she spent in the integrated assessment. She offered no explanation for why she provided DCFS with a different address during the December 2023 assessment. Respondent offered no explanation for why she did not visit her son or engage in *any* services. Respondent's testimony was inconsistent in that she first stated she was instructed to *not* contact DCFS and then claimed that she had repeatedly tried to contact DCFS and all calls went to voicemail. As noted by appellate counsel, respondent's failure to visit her son during the period "sufficiently warrants the juvenile court's finding of unfitness." *In re M.I. v. J.B.*, 2016 IL 120232, ¶ 36.

¶ 38    Based on the foregoing, we cannot conclude that the trial court's fitness finding was against the manifest weight of the evidence. Thus, we agree with counsel that no viable argument challenging the court's fitness finding could be raised.

¶ 39                        III. CONCLUSION

¶ 40    After examining the record, the motion to withdraw, and the memorandum of law, we agree with counsel that this appeal presents no issue of arguable merit. We grant the motion to withdraw and affirm the judgment of the circuit court of McHenry County.

¶ 41    Motion granted; affirmed.